Case number 20-1187 et al. Beyond Nuclear, Inc. petitioner versus U.S. Nuclear Regulatory Commission and United States of America. Ms. Coran for the petitioner Beyond Nuclear. Mr. Taylor for the petitioners Don't Waste Michigan and the Sierra Club. Mr. Kanner for the petitioner Baskin. Mr. Averbeck for the federal respondents. Mr. Clements, amicus curiae for the Nuclear Energy Institute. Ms. Leidig for the respondent and intervener Holtec. Morning. Good morning. My name is Diane Curran. I represent petitioner Beyond Nuclear. I'd like to save two minutes for rebuttal. This appeal presents a clear case of agency overreach that is redressable by a simple act by this court to sever unlawful language from Holtec's NRC. The NRC says, quote, the entire point of a licensing proceeding is to ensure that any license is consistent with applicable law, close quote. Instead of using its licensing proceeding to ensure that Holtec's operation would comply with the Nuclear Waste Policy Act, the NRC decided for itself how that law might change in the future and granted Holtec a permit to carry out that made up law. The NRC, I'm sorry. The application had just said Holtec will be permitted to take title to whether Holtec will be able to store commercial reactor waste instead of referring to privately owned or DOE owned. So I didn't say this very clearly. I think the application referred to DOE owned and privately owned waste. Correct. What if it had just referred to commercial reactor waste? That would have been consistent with the Atomic Energy Act. And my understanding, I understand this wasn't part of the record when the decision was made, so I take that point. But my understanding is the license itself does only refer to Well, the NRC in the licensing decision approved the application with the intent that Holtec, their decision approved Holtec's ultimate ability to store federally owned spent fuel if the law changes. But I guess my question is, shouldn't it matter that the license itself makes no stated that they intended not for the license to the license activity includes what's also approved in the NRC's adjudicatory decision? It's not just what's in the four corners of the license, which is not part of the record of the case. I understand that. You said earlier, if the application had just referred to commercial reactor waste, the application would have been okay. Yes. And then we end up with a license that licenses exactly what you said would have been okay to apply for. The license always also says that the operation can operate, the licensee can operate in compliance with what was in its application. That is also in the license. And in the application are a number of provisions that contemplate federally storage of federally owned spent fuel. I appreciate that. Is one of your concerns that the license or the application would permit Holtec store foreign waste or non-commercial reactor waste like from Navy ships? Is that not something you're worried about? Not. We're concerned about the issue of there's quite a bit of spent fuel that would be stored, could be stored at this facility. The NRC seems to be contemplating some event where the NRC would say, the government, the Congress would say, we're going to take title for all this commercial spent fuel, which is the Nuclear Waste Policy Act's intention, ultimately, when there's a repository. And they're jumping the gun effectively saying- If the Department of Defense made a hangar for planes, and it said the hangar should be able to accommodate the B-21 or five smaller planes. And there's a statute that says the Department of Defense is not allowed to purchase B-21s. You think that the contract between the Department of Defense and the construction company would be contrary to law, just because it refers to a hangar that can accommodate B-21s? Well, a contract or a permit has to be enforceable on its terms. If this was the NRC, that's the PFS case 52 NRC at 34 that's cited in our brief. This is consistent with the Administrative Procedure A contract or a license isn't supposed to have conditions that people can't understand now or figure out what it means. Hypothetical contract, is that- A hypothetical, yeah, a contract would, in this case, would be analogous to the permit, which is it gives Holtec some rights for what they can do. In my hypothetical, do you think the contract is contrary to law? It appears to be, yes. That's great. Let me ask you, so procedurally, Beyond Nuclear was denied the ability to intervene. And so you can't challenge the license itself. You can only challenge the denial of your request to intervene. Isn't that correct? That's right. When we request a hearing, it has to be based on the application. We have to raise a dispute with the application. We were told you can't raise a dispute here because we all agree that this license application contains illegal provisions. So there has to be, in order to intervene in the proceeding, you have to show that there's some genuine dispute about the law. That's right. And so what can you point to that suggests the law does not permit a conditional license here? So this is different from the don't waste Michigan case. Why can't an agency or why can't the NRC in this specific context grant a license that has some conditions in the future? I mean, we've upheld conditional licenses in a number of other contexts. In Oglala Sioux case, there was a conditional license we've upheld, which is in same context. We've upheld conditional licenses issued by FERC. I mean, it's sort of an ordinary process. So what can you point to that suggests that it's contrary to law? The PFS case is very helpful because that's a case where license conditions were in dispute. But the question there was, the NRC said license conditions are okay if they're precisely drawn and anybody who's in charge of administering the license can understand it without further analysis. So what's not precise here? I mean, what's not precise? Okay, let's just take a hypothetical. I mean, if the law changes, DOE could send their waste to Holtex facility. Like, I don't see what's imprecise about that. And that is certainly the kind of simplistic framework that the NRC sets up here. But let's take a hypothetical. Let's say Congress does change the law. We're 10 years down the road. Congress changes the law and says, we're going to take title to this spent fuel and we will pay. That's the issue. Who pays and how much? What if Congress puts a cap on the amount of money that it will spend? What if they say we'll only pay on Wednesdays and not on Friday? The DOE will be bound by those legal provisions. Well, yes, but we will never get a chance to have a hearing before the NRC on whether that's an adequate amount of money to safely store this quantity of spent fuel. We never got that hearing because nobody knew what the law was. And in the future, if after Holtex now has a license, if we go back and say we want a hearing, they say, oh, it's too late. They've got the license. You can bring an enforcement petition and our decision will be essentially unreviewable under Heckler v. Cheney. We've lost the right to a hearing once Holtex gets a license and there are potential safety issues. We just don't know what Congress might do in this law. Nobody knows. My understanding from the briefing was that NRC says if and when new routes, for example, and new contracts arise, there will be new proceedings in which you can raise objections. That is false. I think that is a false implication. It's at page 32 of their briefing. If you go back to the licensing board decision at page 465 of the Joint Appendix, they say the whole point of this is to avoid a hearing once after Holtex, after Congress changes the law, we can say the hearing already took place. A hearing at that point would be useless, not to us, because we never got the hearing. There may have been a hearing on some issues where the law was clear, but on the very important issue of is there enough money here to safely store this waste, we were shut out from the beginning and we will be shut out if the law this type of license is holding that we are bound by. We did not brief that issue. Our issue is under the Nuclear Waste Policy Act, a completely different statute. We are concerned that certainly if the question of whether the Atomic Energy Act allows private storage is resolved, it still doesn't answer the question of whether the NRC can put a hypothetical license condition into a license like this. It could still be that the NRC's authorization of Holtex to store federally owned spent fuel remains, because they are just speculating. This is a license about what if Congress does something different in the future. It's not about what the law says now. About the fact that DOE does own some of this fuel, so the license is at least valid as to the spent fuel that DOE already owns and that could be stored. That was understand that there's a small amount of that. Yes, there's a small amount of that. It's minuscule in relation to the immense quantity of commercially generated spent fuel, which is at issue. It's the provision non-conditional as to that small amount at least. But clearly the decision was, if you look, if you read the Commission's decision, the licensing board's decision, they were anticipating government storage, a government assumption of ownership of commercially generated spent fuel. There is no doubt in that decision. Just one other question that I had was, your proposed remedy is that this court sever part of the license. Can you point to where we have the authority to do that? It's in the Doctrine of Severability, which... With respect to a license? It has been applied in a regulatory context, but the important point is that unlawful language cannot remain in the license. Whether the court decides to throw out the whole thing or to say, we are rejecting this language and we specifically identify the unlawful language in our brief, that language could be stricken. And we did move the NRC to dismiss the entire application for the unlawful language early on in the proceeding and they refused. This would be going back and granting the relief we asked for, which is resubmit this application and leave out the unlawful language. That could be, we would not object to that. I think Judge Walker asked you about this earlier, but where in the license is the unlawful language? In the license, it's in the provision that says this company is allowed to operate in compliance with its license application. I think it's called the Final Safety Analysis Report. I think I have the license in front of me. I could be wrong. Can you tell me more about where to look? It's near the top. I'm sorry. I don't have it in front of me. It's in one of the clauses. It's a very early clause. It's boilerplate language that the NRC, the application is basically forms the basis for the license. The license itself is kind of a summary document that authorizes the licensee to do what they say they're going to do in their application. That's how NRC issues licenses. Any questions? Okay. Thank you. Good morning. I'm Wally Taylor. I represent several petitioners who sought to intervene in this proceeding and submitted several contentions. All of those contentions were denied. Because the NRC violated its own contention admissibility standard, the commission has repeatedly with their agency decisions said basically that all the petitioner has to do to present an admissible contention is to just raise factual issues and not just conclusory statements or vague allegations. We did that with detailed factual statements, citing to the whole set of documents, and presenting expert testimony. It has to be under the NRC's rules, it has to be information that was previously unavailable. Can you speak to how the information FASCN presented was previously unavailable? I'm not sure that that's the standard for the initial contention. That's something that would be necessary to amend the contention. Isn't that part of the good cause requirement for a new contention? I'm sorry? Isn't that part of the good cause requirement for a new contention to be raised? But we're arguing new contentions. We're arguing our original contentions were not admitted because the NRC looked at the contentions in a manner that would be appropriate for determining the facts at a hearing, but not determining whether or not we had made the initial presentation to just raise the factual issues. I would compare the admission... Are you representing FASCN or the Environmental Partitioners? The Environmental Partitioners. Okay. I'm sorry. Now I understand. Can I direct you... There's so many parties here. I'm sorry. I wonder where we were going with this. I know. I'll ask FASCN that question. Council, in your opening brief, you raised this argument about Bull Creek that we shouldn't look to it, or it can be distinguished somehow. The Commission says you did not raise that before the Commission, and therefore, that it was forfeited. And I think you didn't contest that in your reply brief. I'm just trying to figure out if you're conceding that that issue is not properly presented, or if you have some counter on that. Well, the reason we put it in our initial brief was in anticipation that the NRC would say, well, even if the Nuclear Risk Policy Act doesn't give us the authority, the Atomic Energy Act does. So that's why we put it in our brief. And the NRC presented some extensive... That question is just whether there's any authority to license private away from reactor storage at all, right? And that is a distinct argument from the argument that Beyond Nuclear was raised. Sure. And it's my understanding that that was not exhausted before the agency. You agree with that? Yes. Okay. Thank you. Can I ask you, you have a lot of... Sierra Club and Don't Waste Michigan have a lot of contentions. And what is, if you had to pick one, what is your strongest contention? I think the strongest contention is, well, there are several contentions that involve geology and groundwater, which we put, I think, in issue four in our brief. The contention regarding earthquakes, we relied on a recent, at that time at least, study by Stanford University that the oil and gas industry in doing the fracking had induced earthquakes and that that was at or near the Holtec site. And the NRC responded that, well, that is new information, but they could have supplemented or revised their environmental report. In fact, they did that five times. I thought that NRC considered the 2016 government data and the 2018 Stanford data and explained how the Stanford data was compatible with the government data. Well, the Stanford data... Did they do that? What I just said? Yeah. The Stanford data was more recent, at least at that time. And certainly the more recent data but taking into account the increased fracking activity made the earthquake potential greater. And as far as the groundwater, we had an expert who went through all of the Holtec documentation, pointed out exactly where he felt it was insufficient or incorrect. My impression was that the expert gave really more of a list of questions, didn't really put any facts into contention. Well, he did. I mean, to a certain extent, it was a form of questions, but there were facts because he pointed to references in the Holtec documentation where it was incorrect or misapplied and the NRC's response was that, well, we hadn't really proven anything, but we don't have to prove anything at that point. That was my original point here that I made is that we presented enough through expert opinion, references to the Holtec documentation, setting up the facts to lay a predicate for the admissibility of that contention. And then once it's admitted, then Holtec and after discovery, Holtec can file what is in essence a motion for a summary, a disposition, much like in a civil case. And in fact, I would compare the contention admissibility question to the review of a motion to dismiss regular civil litigation. If you, on the groundwater expert witness, if you had to point to one material fact that the expert put into dispute or that is in dispute, that the expert asserted, what's what one material fact would you... What I can think off the top of my head is that he said there was only one attesting well in the area where it was most important. And Holtec said, well, we did four or five of them, but the expert made clear that those four or five others were not in a place where it was relevant. So I think... Do you have a question? Oh, my time is up. I'm sorry. Thank you. Good morning. Alan Kanter of Kanter and Whiteley, on behalf of Faskin Land and Minerals and the Permian Basin Land and Royalty owners, collectively I'll refer to them as Faskin. That's okay. And I'll reserve three minutes at the end. This is a case about competing land uses at a specific site in the Permian Basin and NRC's decision to allow Faskin to make a record... Decision not to allow Faskin to make a record that these were incompatible land uses. Instead, NRC threw out the rule book in favor of a garbage in, garbage out approach, which would lead it to its predetermined results. The Permian Basin, briefly... The question that I asked the other council is, what is the previously unavailable information that Faskin presented that would allow it to reopen the record or to show good cause for entering its contention? So the 2020 affidavits of Stoney Pollack and Tommy Taylor are probably the most useful. For example, Mr. Pollack talks about the karst about 1,200 feet. As you know, in the final EIS, a decision was made that it was unlikely that fracking would occur above 3,000 feet. That is different information. That is information that was disregarded by the NRC. He also talked about trends. If you're giving a license, you've got to look into the future a little bit. Fracking technology is evolving very rapidly. I guess I don't understand how that is something that wouldn't have been available for him to testify to earlier. Ah, good question. That's because Holtec lied and filed an incomplete application, inaccurate and incomplete, contrary to NRC rules. Specifically, they said that by agreements, they had control of the land. So in other words, when you say you have agreements with third parties, what you're telling Faskin, who doesn't know this is a lie, is that you've contacted all their mineral lessees, and you've also talked to the state regulatory authorities, the state land office, for example, because what they said is there would be no drilling above 5,000 feet. That's a lie. We know it's a lie because the final EIS says that there is no control. Regardless of what Holtec said or didn't say, it seems like an assertion that fracking technology evolves is not something that was unknowable back when Faskin first had an opportunity to submit information. But to what extent would it matter if they had total control of all activities there? I mean, what would the contention have been? Because there was no one of the things that I said this was a lie, and I also said it was incomplete. They went through about 10 iterations of their application, and it was kind of a moving target through the whole thing. But if somebody says that we control by agreement all of this, then what's the materiality of the changing technology? Only when the land office said it was a lie, we acted immediately. A couple of different things. In your opening brief in the second footnote, you say that this appeal is moot after the Fifth Circuit's decision. This is similar to a question I asked one of the parties in the previous case, but if it's moot, then don't we lack jurisdiction to consider your The Fifth Circuit ruled on the merits in the ISP case. However, it's not a final decision. They've asked for a rehearing of the matter, but the NRC told the Fifth Circuit that the Holtec case was on all fours with the ISP case, and that was the sense in which I meant it was moot. It wasn't materially different. Has something changed? I mean, you're saying that the bank has taken it from being moot to not moot? It's not clear if they're going to take it or not. I'm trying to be honest and just say it's up in the air in that sense. So it's your job to show jurisdiction. We don't have jurisdiction if your petition is moot, and you've said your petition is moot. So putting two plus two equals four, it seems like you haven't shown jurisdiction. I believe that jurisdiction has really not been disputed. If that was in some sense misleading, we did want the court to understand that there had been a ruling in the Fifth Circuit and that the NRC had said that the Holtec situation would be bound by whatever was decided in the ISP case. If I should have used another word, I apologize. I think I get it. I get it. And then this is my last question. The NRC found that even if your contentions were true, they weren't material enough to justify reopening the record. And I'm sure you disagree with that, but where in your opening brief do you explain why that conclusion was wrong? If I may explain it now, we talk about... You start with where in your brief you said it, and then it's fine with me if you expand. I'll get you that if I could. We talk about the final environmental impact statement in our brief, and in the final environmental impact statement, what they say is it's unlikely that anybody will mine potash, and it's likely that it will never be below 3,000 feet. That's why it's material. They basically admit it's material. And interestingly, they say that they're relying on new information, which is the same information that we tried to present to them. This is a highly unusual case because basically the contention we were making about there not being any control following the New Mexico land office, ultimately, not in the DEIS, but in the final EIS, they said, oh yeah, that's right, there's no control, but it doesn't matter that there's no control. And then they make these statements like, well, it's unlikely for economic reasons that anybody's going to go after potash, when under the rules, they really have an obligation to look at what that means. And so in this case, I think that we need a do-over, at least with respect to the The International Agency for Atomic Energy says that... Before you go on too much, because I know you're running, looks like you're low on time. I don't know if your co-counsel has found the page number or not. I'd like to know the page number of your opening brief where you say this. Okay. Do you want me to stop and look for it, or you want me to answer other questions while she's looking? You can tell us on rebuttal. What? Thank you very much. I'm sorry, I didn't have it on the top of my head. Good morning. May it please the court. My name is Andrew Averbach from the United States Nuclear Regulatory Commission. I appear on behalf of the federal respondents. I'm prepared to answer questions about the arguments that each of the petitioners have made, but I'd like to focus my time on the assertion that the agency lacks statutory authority under the Atomic Energy Act to issue licenses for the away from reactor storage of spent nuclear fuel. That argument fails for three independent reasons. First, the argument was not presented to the commission and therefore has been forfeited. Second, the argument is precluded by this court's holding in Bull Creek versus NRC. And third, the argument fails on the merits. The commission, sorry, the Atomic Energy Act confers authority on the commission by its plain language to issue licenses to private parties for the away from reactor storage of spent fuel, both, in fact it does, it confers authority on the agency to issue licenses both at reactors and away from reactors. I'd be grateful if you could start there. What's the specific statutory provision that gives you the authority to license, to do a license like this? There are three separate provisions of the Atomic Energy Act, which authorize the commission to issue licenses for the constituent components of spent nuclear fuel, specifically 42 USC 2073, 42 USC 2093, and 42 USC 2111, covering source by-product. The special nuclear waste and the by-product, and there's one more- Source. Source. And is your argument that each of them alone would authorize this license? No, Your Honor. The argument is that the three acting in concert, because spent nuclear fuel contains each of those three core potential radioactive- I guess I would understand how each of them individually would, because if a spent fuel rod has special nuclear waste in it, and there's the authority to do a license for storing it, then there's authority to do a license for storing the fuel rod, regardless of what other types. The argument that none of them is individually sufficient, but we sort of like do a number of emanation analysis of all three, and when we combine them into a cocktail, they give you the authority, I think that's a harder argument. Well, Your Honor, to be clear, there's no spent fuel assembly that contains only one, and there's a prohibition against the possession without a license of any of the three materials. So in order to possess spent fuel, and not be prohibited from doing so, one needs to have a license to possess special nuclear material and source material. Each of the three requires a license, and each statutory provision gives Holtec, in this case, gives the NRC authority to allow Holtec to store that thing, and so in order to store a fuel rod with all three of those things, you basically need a license to store all three of those things. That's correct, Your Honor, and the license refers to each of those three types of materials. I wanted to at least begin my discussion of the AEA issue with this court's holding in Bull Creek. I know that there's been discussion both from the petitioners here, as well as from the circuits, this isn't suggesting that this court only assumed the existence of that authority in Bull Creek, but I would submit that's not correct, Your Honor. The Bull Creek decision was premised on the acknowledgment and the recognition of the NRC's authority under the AEA to issue licenses for away from reactor storage, and the reason I say that is because the court was construing 42 U.S.C. 10155B, sorry, 10155H, which says, quoting generally, nothing in this chapter, i.e. the NWPA, shall be construed to authorize or encourage the private use of away from reactor storage, or the federal use of away from reactor storage. But in order to reach the conclusion that that provision had not completely eliminated the NRC's authority to issue a storage license, the court specifically recognized that this authority existed not under this chapter, but under the AEA itself, so it had to carve out, it had to interpret that language in order to understand that there had not been a revocation as a consequence of the passage of the Nuclear Waste Policy Act, and then to conclude that passage of the Nuclear Waste Policy Act had left the agency's AEA authority, in this court's words, untouched. And is that in part because implied repeals are disfavored? Yes, Your Honor. The court certainly cited, Bulkery Court cited to that precise price principle. Let me turn also to the issue of the agency's actual authority, meaning the merits of the case. And as I mentioned, that authority is provided by the three separate statutory provisions that I've referred to. Now, there has been argument in various briefs that we've, that we've received and that have been submitted to the court, suggesting that the fact that spent nuclear fuel is not referenced in any of those three statutes somehow means that the agency doesn't have authority to issue licenses of this type. But none of the material licenses that the agency, none of the authorities that, pursuant to which the agency issues materials licenses, specifically name any kind of products or devices or items. Rather, Congress gave the agency the authority to issue licenses based or with reference to the core potentially radioactive materials that the licenses would cover. So, in all kinds of licensing actions, such as for fuel fabrication facilities or uranium enrichment facilities or commercial radiators, those products, those items are not specifically named in the materials licensing provisions of the AEA. Nonetheless, the NRC has been issuing licenses of this type for 75 years. How common is it for an NRC license to have a condition, like the type of condition here about DOE? You know, where some authority is granted in the future if there's a change in circumstance or a change in the law. Is that fairly common? Well, there are conditions in many of its licenses. I'm a little perplexed by the question, though, only because the license itself doesn't actually refer to DOE. It's certainly the application that was submitted referred to nuclear power plant owners and or DOE. But that language is actually eliminated in the license. So, is it the NRC's position that if the law changed, couldn't take material from DOE? If the law changed? Like, if Congress changed the law to allow that, is that not within the license? Your Honor, if Congress were to change it and all other aspects of the fuel were covered by the license, such as that it satisfied the host of safety requirements that are incorporated into the license, then there would not be any particular prohibition against storing this DOE title, fuel to which DOE is acquired title. But we're not at that point. Holtec has made a representation to the NRC that as long as that remains illegal, that it won't do it. And in the event that it tried to, there would be adequate remedies in order to prevent that from happening. Is that true only for commercial reactor wastes? Well, the license, this particular license is for the storage of commercial waste. If Your Honor is referring to defense waste, I think that's beyond the scope of the license. What would be those mechanisms? I mean, Ms. Curran said for Beyond Nuclear that there would be no way to challenge this in the future. Is that the Commission's view of that? A couple points. First, the Commission could take action as against its licensee in order to enforce the representations that were made to it during the licensing process. Second, I think that if the Department of Energy were to accept fuel that was deemed to be an illegal transfer of title, then there would be action as against the Department of Energy pursuant to the APA or the Nuclear Waste Policy Act or potentially under the Hobbs Act. I mean, there are a variety of different vehicles that might be employed to do that. But certainly, the agency would hold the licensee responsible for violating representations it made during the course of the licensing proceeding. And those representations the NRC considers to be bombing, much as if this court instructed me on behalf of the NRC to notify the to petitioners. As against the NRC? Well, Council mentioned what's referred to as a citizen petition or petition pursuant to 10 CFR 2.206, which asks the agency to take action as against the licensee to suspend or modify or amend the license in the event of identification of some form of safety issue. But declining to enforce would not be judicially reviewable? Well, Your Honor, there are two separate questions about that. One, there's jurisdiction under this court's under the Supreme Court's decision in Laurian. In Laurian, there is a presumption of unreviewability for prosecutorial discretion types that you're referencing in Heckler v. Cheney, but it's not an insurmountable task. I recognize that it takes a showing of an authority or something to that effect. But we have seen litigation challenging the commission's denials of 2.206 petitions and forced to defend them on the merits. The only other point I'd like to make... Can I just follow up on that issue? So at a sort of a first level, I understand your argument to be that this is a license to hold a particular type of waste. And this is what the who the waste comes from. It matters that we've approved this site with these practices and at this location to store this type of waste. Is that everything I've said so far correct? Yes. And without overstating... Yes, Your Honor, it is correct. Without overstating or oversimplifying, the commission's focus is on the safety of the storage of the fuel. I don't want to minimize the issue that's been raising here by suggesting that's a paperwork issue. But fundamentally, the owner of the fuel is not a consideration that the agency needs to take into account in determining whether or not the storage of the fuel is safe. Right. So the hypothetical I think they spun out, I'm not sure this was in their brief, but it was if Congress in the future allows DOE to store this type of fuel with a private company and but imposes funding restrictions that might hypothetically mean Holtec can't get enough money to follow what it promised to do in the license, that that would raise a practical concern. And it seems to me that would raise a practical concern if there was no way for them or the commission to challenge and enforce the license against Holtec. It seems to me like your answer is the commission would enforce... Recognizing that it's not... Well, certainly the commission would... Well, I didn't quite catch the last part. Your position is if they didn't have enough money, DOE funding to comply with the license, then they would just be violating the license and the commission would Absolutely. And I would note too that the commission's oversight over licensees is certainly informed by citizen petitions that might come in, but also by its ongoing enforcement of regulatory requirements. And on a yearly basis, the agency makes sure that there is adequate funding in place, for example, to provide for decommissioning in the event that decommissioning becomes necessary. So it's not as though the agency simply closes the book on its oversight of the financial arrangements of the facility. And were there to be a meaningful change in the conditions such that what had previously happened with respect to privately titled fuel might no longer be applicable, that would certainly provide an impetus for the agency to investigate further and to oversee... But it's not as extreme... The world in which their complaint would make even less sense would be if, for any future contract, Holtec reaches with a private company or with DOE, that that contract itself needs to be approved by the commission. And my understanding is that that's not the way this will work in the future. Holtec, if it finds a license or such that, as issued... Should sort of self-execute. Yes, but the agency does commit itself to oversight to make sure that these requirements as, you know, not only the health and safety aspects of its oversight, but also the financial elements of its oversight are satisfied on a periodic basis. And to the extent they're not, then the agency would take appropriate action. You could have just... I think you could have said, for environmental effects, we've evaluated this fuel and it doesn't matter who owns it, private or DOE. But I think instead you said, we've evaluated... We've done the environmental evaluation for privately owned and for DOE owned. But there isn't much DOE owned. So I'm not sure what you meant by that. I'm not sure I said that. So if there is... You're not sure what? Sorry. I'm not sure I said what. Well, not you specifically, but I think amid JA465, the NRC staff assures us that the staff bases its safety and environmental reviews on the application as presented, which seeks a license on the basis that either DOE or private entities may hold title to the waste. So it seems like you're assuring us that you're reviewing the application in light of both possibilities. Maybe I'm wrong about that. And then if you are reviewing the environmental effects in light of both possibilities, the possibility that's legal now and the possibility that may one day become legal, I guess, how did you do the evaluation for the possibility that might one day become legal if at this time there isn't much DOE owned fuel to... I don't believe that there are any distinct environmental effects of owning fuel to which the Department of Energy as distinct from a commercial utility... That was my guess. That's correct. From a health and safety perspective, no. From an environmental perspective, no, it doesn't make any difference. There's a different amount of paper. There will be different forms involved, but I don't think that there's a distinct effect. That's what I thought it meant and that's what I was hoping it meant, but I just wanted to make sure that's what... Your Honor, unless there are any further questions. Thank you. Good morning, Your Honors. May it please the court, Paul Clement for the amicus NEI. I'm going to The first of that is this question about the status of Bull Creek and whether the Atomic Energy Act provides the authority for off-site storage. That issue is incredibly important to my clients, but as I understand where we are in the case right now, it's been forfeited twice over and I thought I heard my friend from the Sierra Club basically say they're no longer taking issue with that, no longer even really raising it. So as much as my clients would love a full-throated re-endorsement of the holding, which was in fact a holding, unless the court has any questions, I mean, it just seems like there's not too much to say about that issue. So maybe then I'll turn to the second issue we addressed in the brief, which is the beyond nuclear argument that somehow the sort of disjunctive reference to the possibility of DOE taking title somehow makes this whole process unlawful. And let me start by just trying to underscore how absolutist and extremist that position is, because what it really comes down to concretely is that in the proposed application, and this is on page 40 of the joint appendix, in the 17th condition on the proposed license, there is a parenthetical and disjunctive reference to the possibility that the spent nuclear fuel that's going to be stored in this facility is DOE or privately owned. And as Judge Walker alluded to, although it's outside the record, by the time you get to the actual license, the parenthetical disappears. And of course, that makes sense because the parenthetical is actually not even particularly necessary to anything. It's like, you know, if you were thinking about like a pedestrian example, like licensing a bar, and it said that, you know, we'll have a capacity for 200 lawful patrons, and then it said 18 or 21. I mean, you know, and maybe this is just pointless formality, but I think we're not reviewing the license, we're reviewing whether the contentions were properly rejected, but the final license wasn't before the NRC when it rejected the contention. So what's the argument for why we're allowed to kind of peek at the final license? You can, what, I don't, it doesn't even matter whether you can peek at it, because I'm not sure you can as a technical matter. My point is that if the relief is to strike something that's actually superfluous, like that just shows there's something wrong with the argument that's actually before you squarely. And so that's why I'm pointing to what is in the joint appendix, which is in the record, and it shows you that this is just a, it's a disjunctive parenthetical. And the reason it can be in a parenthetical is because it doesn't really matter for purposes of this whole licensing process who takes, who has title to the spent nuclear fuel. And maybe this will help kind of clarify. But does that mean, I mean, is the consequence of that that it could hold tech eventually if it became lawful take DOE titled waste? Yes, it could under, under the proposed license, under the licensed as issue. And just to make clear, like, and why would that be? I mean, because you're relying on the fact that it's not even in the final. No, but what's not in the final is the parenthetical. There's still this condition that you have to have a contract with somebody who has spent nuclear fuel. It just no longer specifies that that could be DOE in some future world, or it could be a private party right now. So the superfluous parenthetical has dropped out, which shows that it's superfluous. And the license is now written in a way that basically says anybody who lawfully owns the commercial spent nuclear fuel can contract with whole tech DOE at some future date lawfully own such fuel. They could contract with Holton. Yes. And the same way a private entity could. Absolutely. And just to make this even more clear, as a practical matter, in theory, in theory, it could be some other spent nuclear fuel that DOE somehow takes title to under some change in the law. But what we're really talking about is the exact same spent nuclear fuel that is currently in, you know, on-site storage facilities, including at decommissioned sites. And as a technical matter, the reason that DOE can't take title to that right now is because the Nuclear Waste Policy Act said that they can't take title to that until the Yucca Mountain facility is operation. So we have this, you know, unusual situation now where, you know, the federal government is essentially paying for the storage of this spent nuclear fuel because of decisions that have said other provisions in the act mean that as of 1998, the federal government is basically on the hook for the storage costs, but they can't take title under the laws it currently stands. And all the license did here is quite sensibly observe that and say, you know, that's not the most, like, long-term stable solution in the world. And maybe at some point Congress is going to revisit this and transfer title to the same spent nuclear fuel back to DOE, and that's not going to make any difference as to, you know, as you alluded to. But that's why I think the provision in the joint appendix you were reading, you know, nothing turns on literally who has title to the waste, because it's the same darn waste at the end of the day. And so, you know, some of the arguments that you see, like in the licensing process, like if it's timely raised, I suppose the commission can consider the Karst formulations under the storage facility, but the Karst doesn't change if title shifts from a private party to the DOE. And so that's... In re Aiken, you know, they make the argument that, well, the NRC erred then when it said the law might change, so we're going to act as if the law might change. And here the NRC is acting in a way that sort of assumes the law might change. Yeah, and I think the difference in the end is in re Aiken made that assumption, and then they did something that was currently unlawful, unambiguously so. They wouldn't move forward even though they had the command to do it, and there were available appropriated funds. So with all due respect to my friend, I can understand why this court, you know, issued a mandamus there, but this situation is nothing like that. I mean, and this situation is very much like your hypothetical about the hangar, where it, you know, it's actually kind of sensible government to say, all right, we're building a facility, we want it to work now, but if in the near future, there's a possibility that there's going to be a bigger airplane authorized by Congress, it would really be imprudent to have a hangar that isn't big enough for this new plane. Can you think of any other examples? You know, I also thought of like a building permit that you can't actually act on the permit until something's been rezoned. Do you have any examples that can help? I don't know that I have any other sort of examples that help. What I would say is two things. One, I think this is the easy case because this isn't a situation where the only thing that the license is designed for is currently not authorized by law. I would say even in that case, there's not an APA problem with that kind of conditional license. But here, since it's in the disjunctive and there is a real world example where it's perfectly fine, then that seems to me to be the relatively easy case. That's why I think it's like, okay, I got a bar, I want a license, the drinking age is currently 21. I want to make sure that the license for the facility, which really doesn't turn on the age of the patrons, it's still valid if they change the drinking age. So I got a provision in there that says that there's no separation of powers problem there. There's nothing remotely problematic. In your view, this isn't even a conditional license. This is a license that says you can do this. And, you know, some other activities may come into what the license approves in the future. This is a conditional license with a reference in the disjunctive, in a parenthetical to the possibility that the law could change and whole tech would end up contracting with DOE rather than the private parties that currently have title to the spent nuclear fuel. Thank you, your honors. Thank you. May it please the court. My name is Anne Leitich from Pillsbury Winthrop Shaw Pittman, representing Intervenor Whole Tech International. I'd like to very briefly address some of the fasking contentions, specifically fasking contention, amended contention two and contention three. Once those came into this proceeding, they didn't, they should not have challenged the whole tech environmental report. What they needed to challenge was the staff's draft environmental impact statement, because that was the active licensing document at that stage of proceeding. The draft environmental impact statement does have a drilling depth of 3,000 feet, does recognize that New Mexico holds title to the land and a variety of other things that fasking has not challenged. But at that point, when fasking came in and attempted to demonstrate a dispute with the application, they needed to demonstrate a dispute with the draft environmental impact statement. Of course, they also needed to demonstrate that they met the motion to reopen requirements. And we don't believe that they've met those here. The reopening requirements are, it's a very high bar to reopen an NRC proceeding after it has closed. And this court has upheld those requirements before in Duke-Majan v. NRC, which is referenced in the Blue Ridge environmental case. And that actually provides a factual basis or a factual scenario where reopening the record once did happen. And you can tell when you read the case that it is a very, very high bar. We don't believe fasking ever met that bar here. In fact, I don't believe that they ever really attempted to meet that bar here. And as a result, that's one of the many reasons why these contentions were not admitted by the licensing board or the commission. The environmental petitioner said they think their strongest contention is the earthquake and groundwater contentions. Is there anything today that you'd like to respond to? No, I believe that the judges have read it correctly. The earthquake contention was rejected because the Stanford report did not actually dispute the content of the application. If you go and look at the application on pages 407 to 408 of the joint appendix, you'll see a description of fracking and the impact on earthquakes in the region. It specifies actually where the earthquakes are happening. It specifies the location of the faults in the area. And all of that is consistent with the information that was in the Stanford report. So while environmental petitioners had an expert report, that expert report did not demonstrate a genuine dispute with the application as it was required to do. In terms of the groundwater contentions, an overarching theme in the groundwater contentions is that the expert report did not address relevant information in the application. Again, this is required to establish a genuine dispute under the NRC's rules that there needs to be a challenge to all of the relevant information to demonstrate that there even is a contention that is worth having a hearing on. If the expert fly specs takes one sentence here, one sentence there, and says, I dispute the sentence, you only had one well. Well, there were four wells. There were four wells. They were monitored for groundwater as the wells were drilled. There was a quality assurance program that was applied, a variety of other reasons to water in those locations. And the expert has to address that information when they come in. Otherwise, there's no way of the commission knowing if there is a real dispute here, which is why these contentions were rejected. Before you're out of time, just to be extremely, almost unnecessarily clear, if Congress does not change the law to allow DOE-owned waste to be stored here, you do not plan to store DOE-owned waste? Holtec will not store any waste that DOE has taken title to illegally under the Nuclear Waste Policy Act. That's correct. For those reasons, we request the petitions to be denied. Thank you. Ms. Kern, we'll give you two minutes. Judge Walker, I'd like to give you the paragraph number for the license. It's paragraph nine. It says the license authorizes Holtec to operate as described in the final safety analysis report, which is the language used to describe the application. If you look at footnote three of our opening brief, it lists the language in the provisions of the FSAR that are unlawful. It was said that this is the same darn waste at the end of the day. It doesn't matter who owns it. We don't think that's true because so much is about money. This is expensive material to care for safely. Safety is paramount. It's often an issue, who's going to pay for how long and how much. We don't know what the Congress may do if the law changes with respect to those issues. We want our rights to be heard. That can only happen if Holtec is forced to wait to apply for a license or a license amendment. That same argument would apply to any contract with a chance to talk about who's paying for how much. Instead, the recourse will be to make sure that Holtec is following the provisions of the license, right? Right, but the devil is in the details in the license conditions, which we would want to say in the PFS, the private field storage decision, once we knew what was Congress going to provide for in could ask for license conditions to make sure that the commitments were adequate to cover a very large quantity of spent fuel to be stored for a very long time. That takes place in the licensing proceeding. Once the license is issued, I think Mr. Aberbach made it pretty clear, we have no rights anymore. The NRC is on its own to decide whether and to what extent to enforce the license. Just one more comment about the Aiken case. That was a case in which I think the NRC was described as defiant. We think that applies here too. Right at the outset of this proceeding, we asked the NRC to send this license application back, ask Holtec to take out the of spent fuel. But the NRC refused and continue. Thank you very much. Until that very last argument on the other side, I hadn't heard anything in response to our argument that the condition and disability standards were violated. I thought maybe I was going to go by without having to respond to that. Ms. Lohning, I think, made a statement that really explains what we're dealing with. She said our groundwater expert should have requested information. At the condition and disability stage, we go by what the applicant, in this case Holtec, has put in their application documents. Discovery occurs after the contention is admitted. That's why we feel that the agency violated its own contention and admissibility standards. Since Mr. Aberbach spent his argument about the Atomic Energy Act, I got permission to just make some brief comments in response. The Fifth Circuit in Texas versus NRC went through all of that and explained in detail why the Atomic Energy Act does not give the agency the authority to license the circuit. That's the Fifth Circuit. Thank you. Thank you, Judge Walker. We talked about it in a number of places. In our brief, the statement of issues presented obviously deals with reasonably anticipated future extraction operations and selection of Holtec. In addition, on page 16-17, we talk about the information was material to the required findings needed to satisfy the NRC citing. I will say that because of the word limitations, we reference other materials like our contentions where we talk about it in greater detail and where the affidavits appear that I cited from earlier. Most importantly, and this goes also to the comment about materiality, the NRC staff agreed that contention 2 would be admissible in part to the extent that FASCN challenges the application's description of Holtec's control of mineral rights, including oil and gas extraction underneath the site. It has proffered an admissible contention specifically by identifying what it asserts are material inconsistencies and potential inaccurate statements in the application that directly bear on the analyses. It also goes on to say FASCN has provided the necessary threshold support for its dispute with Holtec's purported ability to control and limit future oil drilling and mining beneath the site. What happened was we were held to an elevated standard of good cause, and we believe showed it. What the agency said was, oh, no, this was all previously available. But that doesn't make any sense that it was all previously available. A, why did the state land office decide to send this out and say your allegations are just wrong? How would we have known anybody lies? You don't walk into these applications and assume somebody is lying about controlling all of the minerals. And, frankly, thank you very much, Your Honor.
judges: Rao, Walker, Garcia